**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.

SHAPESHIFT US, INC., a foreign corporation,

    Plaintiff,

v.

AZAMAT MUKHIDDINOV, an individual,

    Defendant.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff ShapeShift US, Inc. ("ShapeShift" or the "Company"), by and through its undersigned attorneys, submits this Complaint and Jury Demand against Defendant Azamat Mukhiddinov ("Azamat") and states as follows:

### PARTIES

1. ShapeShift is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1624 Market Street, Suite 226 #29882, Denver, CO 80202.

2. Azamat is an individual currently residing at 1650 Wewatta Street, #1618, Denver, CO 80202. Azamat is a former ShapeShift employee who worked as a software engineer.

### JURISDICTION AND VENUE

3. The Court has original jurisdiction pursuant to 28 U.S.C. § 1331, because this action involves a claim asserted under the federal Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030, et seq.

4.      The Court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367 because that claim is part of the same case and controversy and stems from a common nucleus of operative fact as the claim arising under the Computer Fraud and Abuse Act.

5.      Venue is proper in this judicial district under 28 U.S.C. § 1391 because it is the district in which Azamat resides and it is the district within which the conduct complained of occurred.

## GENERAL ALLEGATIONS

### ShapeShift's Business and Operations

6.      Founded in 2014, ShapeShift is a consumer-facing cryptocurrency virtual-wallet and exchange-trading platform.

7.      ShapeShift operates in interstate and international commerce and has users both throughout the United States and worldwide.

8.      ShapeShift's offerings enable users to exchange different cryptocurrencies through a simple and easy-to-use mobile app and web interface, in practice operating much like a traditional foreign-currency exchange provider that would allow users to buy, sell, or exchange Dollars, Pounds, or Euros.

9.      Although ShapeShift never holds or custodies users' cryptocurrency assets, it does maintain large balances of cryptocurrency assets to facilitate user trading.  Such assets are held in company-controlled accounts.

10.     As an Internet-based cryptocurrency company, ShapeShift owns, operates, and maintains a highly complex network of computers, servers, hardware, and software (sometimes referred to herein collectively as "computer infrastructure").

11. ShapeShift heavily relies upon its computer infrastructure to conduct its local, interstate, and international business.

12. ShapeShift goes to great lengths to secure its computers, servers, software, and other tangible and intangible property. The Company utilizes advanced security protocols and procedures to control, access, authenticate, encrypt, password-protect, classify, and transmit information in a secure fashion via its hardware and software.

13. The Company ensures that all employees understand and strictly comply with these security policies and procedures.

### Azamat's Employment and Responsibilities

14. On August 3, 2018, ShapeShift offered Azamat a job as a Senior Software Engineer.

15. Azamat accepted this offer on August 6, 2018, and began working at the Company on September 4, 2018.

16. Azamat held that position until his employment with ShapeShift ended on May 25, 2020.

17. As a Senior Software Engineer, Azamat was responsible for working on and maintaining the Company's computer infrastructure. More specifically, Azamat had "site reliability" job duties and responsibilities, which required him to identify and repair structural weaknesses and deficiencies within ShapeShift's computer infrastructure.

18. As part of his employment, Azamat was authorized to access ShapeShift's computer infrastructure for the purpose of identifying, diagnosing, and repairing structural weaknesses. Azamat's authority to access the Company's computer infrastructure was limited for the specific and narrow purpose of performing these job duties and responsibilities.

**ShapeShift's Corporate and Employment Policies**

19. Given the sensitive financial and technical nature of its business, ShapeShift requires all employees to agree to, and strictly follow, multiple policies designed to protect both the Company and its employees.

20. When Azamat accepted employment with ShapeShift, his offer letter informed him that he would be required to sign and abide by those policies.

21. One such policy is ShapeShift's Information Security Policy ("ISP"), which Azamat acknowledged, agreed to, and signed on August 17, 2018.

22. The ISP describes the Company's information-security practices and outlines the duties and responsibilities that all employees, including Azamat, have when accessing or handling ShapeShift's computers, network, or any of its other secure information or property.

23. In accordance with the ISP, Azamat agreed not to: (1) install or execute any application on ShapeShift-owned computers or devices without proper and valid licensing and approval; (2) access or interact with any ShapeShift account or system except in accordance with the Company's Account Access Policy; (3) gain additional or altered access to ShapeShift's computers and systems without manager approval; and (4) engage in any activity that jeopardizes the security of ShapeShift's hardware or software.

24. Additional policies regarding appropriate and authorized employee conduct appear in the Company's Employee Handbook (the "Handbook").

25. From time to time throughout his employment, and most recently on April 14, 2020, Azamat received and signed a copy of the Handbook.

26. By signing the Handbook, Azamat agreed to abide by its terms and conditions, and: (1) uphold high standards of integrity by not engaging in any conduct that was dishonest,

4

destructive, illegal, or that violated any of ShapeShift's rules, practices, or policies; (2) act in accordance with ShapeShift's Code of Business Ethics and Conduct by obeying all applicable laws and regulations; (3) follow the Company's Ethical Standards policy, which requires acting with ShapeShift's best interests in mind and prohibits using information learned on the job for personal or familial benefit; and (4) adhere to the Company's Electronic Communications policy that prohibits employees from storing, transmitting, or retrieving electronic data or information on ShapeShift's computers or systems unless the employee is specifically authorized to do so and is acting in furtherance of his or her job duties.

### Azamat's Violations of the Law and Company Policies

27.     On Thursday, May 21, 2020, Michael Perklin, ShapeShift's Chief Information Security Officer, was notified by the Company's Finance and Operations staff that their attempts to reconcile month-end balance sheets had uncovered evidence that bitcoin assets in the amount of approximately $900,000 (approximately 90 bitcoin) had been impermissibly transferred out of ShapeShift's corporate account and into an unknown and externally controlled account.  Stated simply, someone had stolen, via electronic transfer, $900,000 worth of bitcoin from ShapeShift.

28.     Upon learning of this theft, ShapeShift immediately launched an investigation to determine how the Company's assets had been stolen, and whether they could be recovered.

29.     Over the course of the next few days, the Company, utilizing a tremendous amount of its internal and external resources, collected and analyzed a variety of information.

30.     By Sunday, May 24, ShapeShift had collected and analyzed enough information to discover that Azamat was responsible for stealing the bitcoin.

31.     The Company learned that Azamat, by exploiting a weakness in the Company's computer system, had knowingly and purposefully installed a program on ShapeShift's computer

5

network that, upon each execution, transferred approximately one-half of a bitcoin from ShapeShift's corporate account and sent it to Azamat's externally controlled and owned personal account. Moreover, ShapeShift learned that Azamat had taken additional measures to ensure his program remained undetected. He named the program to make it appear as though it was part of the Company's standard operating infrastructure.

32. The installation and operation of this program fell outside of any activity Azamat was authorized to perform, had no legitimate business purpose, and was never known to or authorized by any ShapeShift employee. Indeed, as a software engineer responsible for finding and fixing weaknesses in the Company's computer systems, Azamat should have reported—not exploited—any security weaknesses.

33. ShapeShift's investigation revealed that the installation and operation of Azamat's program could not have been by mistake. The program entailed a complicated set of commands that needed to be deliberately installed, operated, and maintained. These commands would never have existed in the Company's system absent deliberate actions to create and place them there because ShapeShift would never transfer bitcoin from its corporate account to an unknown, privately held external account.

34. ShapeShift further learned that the program Azamat installed was initially run manually instead of automatically. That is, Azamat needed to affirmatively access ShapeShift's system every day and manually execute the program for it to function properly and steal bitcoin. Azamat's installation and operation of the program was therefore not a one-off occurrence. Rather, Azamat had to repeatedly operate his program each time he wanted to steal bitcoin.

35. During the course of its investigation, ShapeShift further learned that, in addition to executing the program almost every day over a period of months, Azamat eventually updated and modified it so that it would avoid detection and eventually be able to operate automatically.

36. Azamat began stealing bitcoin in November 2019 and continued until his theft was discovered on May 21, 2020.

37. Azamat's program was executed either manually or automatically almost every day between November 2019 and May 21, 2020, resulting in a theft of approximately $900,000 worth of bitcoin.

### Azamat Makes Partial Restitution

38. At approximately 9:00 am on May 25, 2020, the Company confronted Azamat about his theft.

39. Mr. Perklin, along with other ShapeShift employees, informed Azamat that the Company had uncovered his illegal and unauthorized actions.

40. Azamat admitted to installing and running the program that stole the Company's bitcoin.

41. Azamat agreed to return the full value of the bitcoin he had stolen.

42. Azamat, however, had already spent some of the stolen bitcoin. He had also converted some of the stolen bitcoin to U.S. Dollars. Accordingly, Azamat could not repay all of the approximately $900,000 in the form of bitcoin—some amount would need to be repaid in cash or in the form of other cryptocurrencies.

43. ShapeShift agreed to accept repayment in whatever form Azamat could provide.

44. On the afternoon of May 25, 2020, just a few hours after being informed that his theft had been discovered, Azamat arranged for a meeting with ShapeShift wherein he would provide a cash payment as partial restitution.

45. At approximately 2:00 pm, Azamat met with Mr. Perklin and transferred, via a duffle bag, $31,900 in physical U.S. Dollars.

46. That same afternoon, Azamat also made an electronic transfer to ShapeShift of approximately 60 bitcoin (worth between $8,700 to $8,900 BTC at the time).

47. Over approximately the next week, Azamat made additional repayments of the stolen funds.

48. On May 26, Azamat made another cash drop, this time totaling $7,900.

49. Azamat also made seven Automated Clearing House (ACH) electronic transfers totaling $71,110 U.S. Dollars.

50. Azamat continued to make electronic transfers of bitcoin and other cryptocurrency assets.

51. Eventually, Azamat returned, in one form or another, all of the $900,000 in bitcoin he had stolen.  These payments, however, do not make ShapeShift whole for the damage caused by Azamat's actions.

### ShapeShift's Remediation Efforts and Damages

52. Azamat's unlawful actions required ShapeShift to undertake extensive and expensive remediation efforts with its computer infrastructure, efforts which resulted in significant costs and expenses.

53. Investigating the theft between May 21 and May 25 required ShapeShift to mobilize many of its employees for exceptionally long workdays.  This mobilization caused the Company

to incur expenses it otherwise would not have had to, including overtime pay and meal reimbursements.

54. These employees worked to uncover the extent of the damage Azamat's program had caused, rewrite code to repair and secure the Company's software, and generally undertake a thorough remediation of the Company's computer networks, software, and infrastructure.

55. This mobilization resulted in business disruptions and lost profits because the Company had to reassign employees from other profitable tasks, duties, and projects, and had to temporarily bring its computer network and Internet-based services offline, thus impacting the Company's ability to run its business and generate revenue. Because ShapeShift was then working on a mobile app, which had been scheduled to launch in May, reallocating engineering resources materially delayed the Company's most important project by two months.

56. In order to cleanse its computer systems of Azamat's malicious codes and programs, ShapeShift also had to migrate its systems network and infrastructure to a new digital environment. These necessary actions resulted in service outages and had a negative effect on the ability of ShapeShift to focus on and carry out its business operations.

57. This migration resulted in additional costs to ShapeShift because the Company had to purchase additional services, such as those related to replacing and rewriting production systems, from the Company's third-party network and cloud-computing vendors.

58. Additionally, to ensure that Azamat's malicious programming would not linger or continue to interfere with ShapeShift's business, the Company had to replace approximately five laptop computers.

59. In total, ShapeShift's costs and expenses relating to the investigation of Azamat's theft and the repair of its effects totaled tens of thousands of dollars, if not more.

## COUNT I
### Violation of the Computer Fraud and Abuse Act
### 18 U.S.C. §§ 1030, et seq.

60. ShapeShift incorporates by reference the allegations contained in Paragraphs 1 to 59 of the Complaint as though fully set forth herein.

61. The computers into which Azamat transmitted his program, information, code, or command to steal the Company's bitcoin are used in interstate commerce and are "protected computers" within the meaning of the Computer Fraud and Abuse Act.

62. Beginning in November 2019, and continuing through May 21, 2020, Azamat knowingly caused the transmission of a program, information, code, or command onto ShapeShift's computers and network to steal bitcoin from the Company.

63. Azamat's actions were without authorization and intentionally (a) caused damage to protected computers by compromising the integrity of ShapeShift's computer infrastructure, and (b) caused loss to ShapeShift.

64. ShapeShift has already suffered damages of more than $5,000 from Azamat's unlawful actions, including, but not limited to: (1) investigative and remediation costs incurred in the course of responding to Azmat's offense and conducting a damage assessment, including costs related to additional payroll expenses; (2) network and infrastructure expenses from third-party vendors; (3) costs to replace infected hardware and software and to restore ShapeShift's computer infrastructure to its secure condition; (4) loss of revenue and profit due to interruption of services; and (5) other consequential damages including loss of business, goodwill, and profits. Accordingly, ShapeShift has suffered more than $5,000 in damages in a one-year period.

65. Through the foregoing conduct, Azamat has interfered with the computer systems and resources of ShapeShift in a manner that violates the Computer Fraud and Abuse Act, and he is liable to ShapeShift for his conduct.

## COUNT II
### Breach of Duty of Loyalty

66. ShapeShift incorporates by reference the allegations contained in Paragraphs 1 to 65 of the Complaint as though fully set forth herein.

67. Azamat was an employee of ShapeShift responsible for finding and repairing weaknesses within the Company's computer network and maintaining the integrity of ShapeShift's systems.

68. By virtue of his employment and position, Azamat held a position of trust and confidence and owed ShapeShift a duty of loyalty that required him to act at all times for the benefit of ShapeShift and in the Company's best interests. This duty prohibited Azamat from engaging in the type of conduct described above.

69. Despite the duties and obligations imposed upon him while employed by ShapeShift, Azamat willfully and wantonly breached his duty of loyalty by intentionally and without authorization: (1) installing a program on ShapeShift's computers for the purpose of maliciously stealing approximately $900,000 worth of bitcoin and defrauding the Company of its assets and property; (2) damaging the Company's computer infrastructure, which resulted in costs to investigate and remediate the damage; and (3) causing a loss of business, profits, and goodwill.

70. As a direct and proximate result of Azamat's willful breaches of his duty, ShapeShift has suffered harm, loss, and damages.

71. As a result of Azamat's breach of his duty of loyalty, ShapeShift is entitled to damages and other appropriate relief in an amount to be proven at trial.

## PRAYER FOR RELIEF

72. WHEREFORE, based on the foregoing, ShapeShift prays for judgment against Azamat and requests:

    a. an award of damages in an amount to be proven at trial;

    b. an award of punitive damages;

    c. attorneys' fees, costs, and interest as may be permitted by law;

    d. any such further relief to which ShapeShift may be entitled.

## DEMAND FOR JURY TRIAL

ShapeShift demands a trial by jury on all claims so triable.

Respectfully submitted this 26th day of August, 2020.

    By: */s/ Michael R. Greco*
    Michael R. Greco
    FISHER & PHILLIPS, LLP
    1125 17th Street, Suite 2400
    Denver, Colorado 80202
    Telephone: (303) 218-3650
    Fax: (303) 218-3651
    mgreco@fisherphillips.com

    By: */s/ David C. Roth*
    David C. Roth
    FISHER & PHILLIPS, LLP
    1125 17th Street, Suite 2400
    Denver, Colorado 80202
    Telephone: (303) 218-3650
    Fax: (303) 218-3651
    droth@fisherphillips.com

    **Attorneys for Plaintiff,**
    **ShapeShift US, Inc.**